UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

BRENT UNROE, <u>et</u> <u>al.</u>,            :
                                :    NO. 1:04-CV-00181
          Plaintiffs,           :
                                :    **OPINION AND ORDER**
                                :
   v.                           :
                                :
                                :
BOARD OF EDUCATION ROCK HILL    :
LOCAL SCHOOL DISTRICT, <u>et</u> <u>al.</u>, :
                                :
          Defendants.           :

          This matter is before the Court on the Motion of
Plaintiff Brent Unroe for Partial Summary Judgment (doc. 50),
Defendants' Response thereto (doc. 54), Plaintiffs' Reply (doc.
58), the Defendants' Motion for Summary Judgment (doc. 52),
Memorandum of Plaintiffs' in Opposition to Defendants' Motion for
Summary Judgment (doc. 56), and Defendants' Reply (doc. 59).
Plaintiffs, Brent Unroe, (hereinafter "Mr. Unroe"), Amanda Unroe
(hereinafter "Mrs. Unroe"), Precious Unroe (hereinafter
"Precious"), Unique Unroe (hereinafter "Unique"), and Denzel Unroe
(hereinafter "Denzel") (collectively referred to as "Plaintiffs")
filed their initial Complaint on March 3, 2004 (doc. 1).  The
Complaint was subsequently amended twice (docs. 7, 21).  In
Plaintiffs' final Amended Complaint (doc. 21), they allege
violations of both federal and Ohio law, asserting their federal

claims under 42 U.S.C. §§ 1981, 1983, and 2000d (Id.).  The Court retains pendent jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367.

The Defendants are: the Board of Education of Rock Hill Local School District (hereinafter "the Board") as well as the School District itself (hereinafter "the District"); Lloyd Evans, Superintendent of the District; Fred Evans, Principal of Rock Hill Elementary School (hereinafter "the School") operated by the District; Vicki Evans, Assistant Principal of the School; Connie F. Miller, educational aide at the School; and April Massie, educational aide at the School (Id.).  Mr. and Mrs. Unroe (hereinafter "the Unroes") are the parents and legal guardians of the minor Plaintiffs: Precious, Unique, and Denzel (Id.).

**FACTS**

The following facts are excerpted from the Plaintiffs' Motion for Summary Judgment (doc. 50).  However, the Court notes that the facts are often hotly disputed.  As such where the Defendants contest the version of the facts as recited by the Plaintiffs, the Court so notes.  The Unroes are caucasian and in 1999 moved into the District (Id.).  Mr. Unroe was a teacher who held licenses in both Ohio and West Virginia (Id.).  Initially he was employed by Cabel County Schools, West Virginia (Id.).  In September of 2001, the Unroes began the adoption process of

Precious, an African-American girl, who was eight years old at the time (Id.).  In May 2002 the adoption was completed (Id.).

In October 2001, the Unroes enrolled Precious in the District (Id.).  Precious was designated "special needs" by the adoption
agency, the Franklin County Department of Jobs and Family Services (Id.).  Subsequently, upon enrollment in the District, Precious was placed in a special classroom for children with multiple handicaps (Id.).  During the 2001-2002 school year, Mr. Unroe raised concerns to the Administration of the District regarding Precious' schooling (Id.).  Plaintiffs note that at the time of Precious' enrollment and during the next academic year, the number of African American children in the District was less than one percent of the District's total enrollment (i.e., approximately 1600 students) (Id.).

The Unroes re-enrolled Precious in the District for the 2002-2003 school year (Id.).  In early October 2002, the District had an opening in one of the three multi-handicapped classrooms in its elementary school (Id.).  Mr. Unroe had previously applied for a position within the District and ultimately Lloyd Evans contacted Mr. Unroe concerning the open teaching position (Id.).  Subsequently, Mr. Unroe was offered the open position, which he accepted (Id.).  Mr. Unroe submits that he

-3-

accepted the position so that he could be closer to home and closer to Precious (Id.).

Mr. Unroe contends that Ms. Massie and Ms. Miller were not happy about his new position and that they voiced their unhappiness directly to him (Id.). Mr. Unroe discussed his concerns regarding Ms. Massie and Ms. Miller with Vicky Evans (Id.). In early January 2003, Mr. Unroe met with Fred Evans, the principal, as well as the grandmother of one of Mr. Unroe's students (Id.). At this meeting the grandmother noted that her grandson, Cody, had been pulled by Mr. Unroe from the hallway into the classroom by his heels (Id.). Mr. Unroe did not deny this report, noting that he had indeed done this on a couple of occasions because Cody would sometimes leave the classroom, sit in the hallway, and refuse to get up and return to the classroom (Id.). Mr. Unroe avers that Fred Evans and Vicky Evans informed him that, in the future, if Cody refused to leave the hallway and return to the classroom that Mr. Unroe and one of his aides should get a wheelchair, pick up Cody, place him in the wheelchair, and then wheel him back into the room (Id.). Mr. Unroe agreed to follow this procedure (Id.). Nothing else at this meeting was discussed concerning Mr. Unroe's actions in controlling the children in his classroom (Id.). After this meeting, on January 13, 2003, Mr. Unroe received the only documented evaluation of his

-4-

performance at the School (Id.).  The evaluation conducted by Fred
Evans gave Mr. Unroe good marks and made no mention of any problems
with students (Id.).

In January 2003, the Unroes also received foster
parent status - and, ultimately, full adoption - of Denzel and
Unique who were seven and eleven years old respectively at the time
(Id.).  Unique, like her adoptive sister Precious, was a special
needs child (Id.).  In January of 2003, Mr. Unroe spoke with Fred
Evans about enrolling Denzel and Unique in the District (Id.).  Mr.
Unroe maintains that Fred Evans was less than pleased with the
possible enrollments (Id.).  Nonetheless, Denzel's first day of
class was January 27, 2003 and Unique's was January 31, 2003 (Id.).

On February 4, 2003, one of Mr. Unroe's students,
Dustin, was misbehaving and creating a disturbance (Id.).  Mr.
Unroe submits that it was regular practice to pick up a child
behaving as Dustin was and place the child in the "time out chair"
(Id.).  According to Mr. Unroe, shortly after placing Dustin in the
"time out chair," Vicky Evans entered the room and Ms. Miller began
loudly and unprofessionally complaining about Mr. Unroe (Id.).  As
a result of this alleged unprofessional behavior, Mr. Unroe visited
Vicky Evans' office at the end of the day and spoke to her about
Ms. Miller's behavior (Id.).

The next morning Mr. Unroe arrived at school and he

-5-

noticed that neither aide was in the classroom (<u>Id</u>.). Subsequently, Mr. Unroe was called into Fred Evans' office (<u>Id</u>.). Lloyd Evans was in the office as well (<u>Id</u>.). Mr Unroe was confronted about the incident from

the previous day (<u>Id</u>.). Mr. Unroe submits he was accused of mishandling Dustin and that he denied such allegations (<u>Id</u>.). Mr Unroe also submits that Lloyd Evans stated, "[t]here's more of them than of you, and I believe what they are saying" (<u>Id</u>.). Lloyd Evans allegedly insisted that Mr. Unroe admit to his actions and take a three-day unpaid suspension (<u>Id</u>.). Mr. Unroe requested time to consider the suspension and he was given until the next day (<u>Id</u>.). Mr. Unroe was then sent home for the day (<u>Id</u>.).

The next day Mr. Unroe informed Lloyd Evans that he had done nothing wrong and could not accept a three-day suspension (<u>Id</u>.). Mr. Unroe avers that upon telling Lloyd Evans of his decision, Lloyd Evans responded, stating that he would "ruin" Mr. Unroe's career if he refused the "voluntary" suspension (<u>Id</u>.). Mr. Unroe was subsequently suspended on the spot (<u>Id</u>.).

On February 11, 2003, Mr. Unroe received a letter from Lloyd Evans citing certain charges against him and setting a date for a Board hearing on those charges (<u>Id</u>.). Also on February 11, 2003, Lloyd Evans contacted the Lawrence County, Ohio Department of Jobs and Family Services (hereinafter "LDJFS") and

reported Mr. Unroe for child abuse (Id.). A representative of LDJFS, Karen Martin, reported that Lloyd Evans indicated that Mr. Unroe "grabbed ACV [i.e., alleged child victim] with both arms, carried him across the room, [and] slammed him into a chair" (Id.). Subsequent to Lloyd Evans' report, the LDJFS initiated an investigation into the allegations (Id.). David Carey (hereinafter "Carey") was assigned by LDJFS as the investigator (Id.).

Lloyd Evans acknowledged in deposition testimony that he did not inform the Board of the ongoing investigation by the LDJFS nor did he delay the Board's own disciplinary hearing until after the LDFJS had concluded its investigation (Id.). Plaintiffs aver that Lloyd Evans made the call to LDJFS with full knowledge that Mr. Unroe could ultimately be charged criminally and lose custody of his children pursuant to any investigation conducted by LDJFS (Id.). Furthermore, Plaintiffs maintain that Lloyd Evans knew that a report of child abuse or neglect must be made in good faith (Id.).

The agenda for the Board's disciplinary hearing was established by Lloyd Evans and consisted only of the charges made against Mr. Unroe (Id.). The hearing was set for March 4, 2003 (Id.). Mr. Unroe submits that Lloyd Evans knew that Section 3319.16 of the Ohio Revised Code governed disciplinary hearings against a teacher under a teaching contract and that this Section

-7-

provides that any hearing "shall be private unless the teacher requests a public hearing" (<u>Id</u>.).  The hearing was held in "executive session" (<u>i.e.</u>, closed to the public) (<u>Id</u>.).  Lloyd Evans admitted in deposition testimony that Mr. Unroe never requested that the hearing be public or that the proceedings be made public (<u>Id</u>.).

Prior to the hearing, Lloyd Evans directed his son, Fred Evans, to obtain statements from anyone who claimed to have observed Mr. Unroe "dragging a child or carrying a child across the room" (<u>Id</u>.).  Fred Evans secured statements from fourteen individuals prior to the hearing (<u>Id</u>.).  Either Lloyd or Fred Evans arranged for these individuals to testify against Mr. Unroe at the March 4, 2003 hearing (<u>Id</u>.).  Only a few of these fourteen individuals actually testified concerning the charge in the February 11, 2003 notice to Mr. Unroe, rather many testified about other alleged incidents of Mr. Unroe mishandling students (<u>Id</u>.).

Lloyd Evans noted in deposition testimony that Mr. Unroe was terminated primarily "because of the admissions he [Mr. Unroe] made himself at the hearing" and not because of the testimony of the fourteen witnesses (<u>Id</u>.).  Lloyd Evans recommended to the Board the Mr. Unroe's contract be terminated (<u>Id</u>.).  Ultimately, on March 5, 2003, Mr. Unroe's contract was terminated (<u>Id</u>.).

On March 20, 2003, Carey concluded the LDJFS investigation into the allegations made against Mr. Unroe (Id.). The outcome was a determination that the allegations were "unsubstantiated" (Id.). Carey's report noted evidence of a "power struggle" between the aides and Mr. Unroe (Id.). The report indicated that the aides were frustrated with the way Mr. Unroe was managing the classroom and wanted to return to handling things the way they were prior to Mr. Unroe's arrival (Id.). Carey investigated Dustin's mother, Delita Johnson (hereinafter "Mrs. Johnson") although no one from the District did, and Mrs. Johnson reported that he "had made progress scholastically and liked [Mr. Unroe]," ultimately reporting that she would not hesitate to have Dustin in Mr. Unroe's classroom (Id.). Mrs. Johnson also reported that she had observed the aides not helping Mr. Unroe in the classroom and generally acting "cold" towards him (Id.). She also reported receiving a strange call from one of the aides, which, only later, did she connect with the animosity of the aides towards Mr. Unroe and their efforts to get him out of the school (Id.).

Additionally, Mrs. Johnson testified in her affidavit that she received an "odd" call from Lloyd Evans in which she was told that Mr. Unroe had been suspended for mistreating her son (Id.). Mrs. Johnson inquired of her son, Dustin, whether Mr. Unroe had indeed mistreated him (Id.). Dustin responded in the

negative (Id.).  Mrs. Johnson asked Lloyd Evans what was going to happen to Mr. Unroe and purportedly Lloyd Evans responding vaguely, not giving her any details other than to tell her that there would be a meeting (Id.).  Mrs. Johnson was never notified of the meeting date and, thus, was unable to testify concerning what she knew about the situation (Id.).

Plaintiffs highlight that during the 2001 - 2002 school year, Mrs. Unroe had contacted the District to express issues she had with the District's treatment of Precious (Id.).  Mrs. Unroe's concerns, which she brought to the attention of the District and School administrators, continued during Mr. Unroe's tenure as a teacher with the school (Id.).  Due to concerns regarding the District's motives (i.e., those of Lloyd Evans) for Mr. Unroe's suspension, Mrs. Unroe began documenting her communications to the District and Board regarding Precious (Id.).  Many of these letters she copied to the National Association for the Advancement of Colored People ("NAACP") (Id.).  On February 13, 2003, Lloyd Evans questioned Mrs. Unroe as to why she was copying her letters to the NAACP (Id.).  Mrs. Unroe continued writing letters to Lloyd Evans, each time copying the letter to the NAACP (Id.).

On March 28, 2003, Mrs. Unroe made a formal request to the District for an impartial due process hearing to address the

-10-

issues she had with the District's handling of Precious (Id.).
Mrs. Unroe copied this request to the NAACP as well (Id.). This
formal process is conducted by the Ohio Department of Education
("ODE") and any such request must be forwarded to the ODE (Id.).
Mrs. Unroe forwarded her request to the ODE (Id.). Typically, such
a demand will require the District to expend its own funds for a
hearing officer and counsel (Id.).

Within one month of Mrs. Unroe's demand for a
hearing, Delores Hicks (hereinafter "Hicks") of the Office of
Exceptional Children, ODE, called Lloyd Evans with an offer for the
District to mediate the Unroe's dispute (Id.). According to
Hicks', Lloyd Evans responding stating: "You know, I don't want
them kind here anyway. You know what I mean?" (Id.). Hicks
responded, stating that the Office of Exceptional Children "feels
that all children receives [sic] their quality education . . .
regardless of race, nationality" (Id.). Lloyd Evans consented to
mediation but said, ". . . I'll tell you what, they don't drop this
. . . I'm going to nail them" (Id.). Despite Lloyd Evans' threat,
the Unroes continued to pursue their complaint (Id.).

Subsequent to this phone call between Hicks and
Lloyd Evans, the Plaintiffs contend that Lloyd Evans repeatedly
publicized false allegations of Mr. Unroe's testimony at the
District termination hearing (Id.). Lloyd Evans issued a "News

-11-

Release" in response to an article in the *Ironton Tribune* publicizing the NAACP's claims that Mr. Unroe had been terminated because of the race of his children (<u>Id</u>.).  In that release, Lloyd Evans stated that Mr. Unroe had "testified at the hearing that [he] had drug [sic] a Multiple Handicapped child by the heels on his back on three occasions . . ." and "admitted, after being told not to forcefully handle any child, to forcefully carrying a Multiple Handicapped student across the room and placing him in a time out chair" (<u>Id</u>.).  Additionally, in a May 16, 2003 article printed in *The Columbus Dispatch*, Lloyd Evans was quoted as stating that Mr. Unroe was terminated for "using excessive physical force against two unruly students" (<u>Id</u>.).

On May 16, 2003 (shortly before being interviewed for the aforementioned *Columbus Dispatch* article), Lloyd Evans reported Mr. Unroe to the LDJFS for allegedly abusing Mr. Unroe's own child, Precious (<u>Id</u>.).  Lloyd Evans and Mr. Unroe had not had any type of contact since March 4, 2003 (<u>Id</u>.).  This allegation, avers Mr. Unroe, is completely false (<u>Id</u>.).  Then in a June 4, 2003 letter from Lloyd Evans to a reporter, Patrick Bell, Lloyd Evans again stated that Mr. Unroe admitted at his hearing that he had used excessive physical force on the children in his classroom (<u>Id</u>.).  In a June 17, 2003 *Ironton Tribune* article, Lloyd Evans was quoted as saying, "[Mr. Unroe] was dismissed from his teaching

-12-

position because he abused his students" (<u>Id</u>.). Lloyd Evans also claimed that Mr. Unroe testified at his hearing that "he carried a child across the room and placed the child roughly in a time-out chair" (<u>Id</u>.).

Lloyd Evans made these comments without the benefit of a transcript of the hearing (<u>Id</u>.). He claims to have taken notes at the hearing and presumably referred to those notes when making the comments (<u>Id</u>.). Mr. Unroe submits that if the Court were to review the true and accurate transcript of the hearing no such admissions or statements on the part of Mr. Unroe would be found (<u>Id</u>.).

The Defendants highlight that Mr. Unroe accepted his position at the School pursuant to a temporary certificate to teach special education (doc. 52). According to Defendants, Mr. Unroe had limited experience teaching disabled students (<u>Id</u>.). Defendants note that Mr. Unroe admits that he picked up a student and set him down in a chair and that Vicki Evans and Fred Evans spoke with Mr. Unroe after receiving complaints from his classroom aides (<u>Id</u>.). The Defendants submit that never once during the discussions between Vicki Evans, Fred Evans, and Mr. Unroe, concerning Mr. Unroe's handling of a student, was the race of Mr. Unroe's children mentioned (<u>Id</u>.). Furthermore, the Defendants maintain that Mr. Unroe has no evidence that any Board member voted

-13-

to terminate him because his children are African-American (<u>Id</u>.).

**APPLICABLE LEGAL STANDARD: MOTION FOR SUMMARY JUDGMENT**

The narrow question that this Court must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. <u>See</u> <u>id.</u> at 321; <u>Guarino v. Brookfield Township Trustees</u>, 980 F.2d 399, 405 (6th Cir. 1992); <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479 (6th Cir. 1989). If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e); <u>see</u> <u>Guarino</u>, 980 F.2d at 405.

As the Supreme Court stated in <u>Celotex</u>, the non-moving party must "designate" specific facts showing there is a

-14-

genuine issue for trial. <u>Celotex</u>, 477 U.S. at 324; <u>Guarino</u>, 980 F.2d at 405. Although the burden might not require the non-moving party to "designate" facts by citing page numbers, "'the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.'" <u>Guarino</u>, 980 F.2d at 405, <u>quoting</u> <u>Inter-Royal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. <u>See McDonald v. Union Camp Corp.</u>, 898 F.2d 1155, 1162 (6th Cir. 1990). Furthermore, the fact that the non-moving party fails to respond does not lessen the burden on the moving party or the court to demonstrate that summary judgment is appropriate. <u>See</u> <u>Guarino</u>, 980 F.2d at 410; <u>Carver v. Bunch</u>, 946 F.2d 451, 454-55 (6th Cir. 1991).

**THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT**

The Court remarks from the onset that the Motions, Responses, and Replies filed by the Parties in this matter are often confusing and wrought with misspelled words, incomplete text, and text obviously copied and pasted from one document into another without carefully ensuring that the pasting is complete and void of

-15-

typos or odd characters.  Furthermore, several arguments raised by both Parties are simply ignored by the other, to the extent that the Court is left with a one-sided argument in many instances.  As such, deciphering all of the Parties' Motions was rendered more difficult than it otherwise should have been.  The Court has made its best effort to determine what issue a Party was addressing at specific points in their respective briefing.  The Court is mindful that everyone's schedule is extremely busy, including its own.  However, more careful attention to detail and clarity should be utilized by Counsel for both sides in the future.

As the Parties have filed Cross-Motions for Summary Judgment, the Court makes every attempt to address the Parties' arguments in a logical manner.  However, as just noted, this process is complicated due to the quality of the Parties' briefing.  In any event, the Court now turns to the Parties' arguments.  Additionally, the Court notes from the onset that the Plaintiffs have dismissed Claims Nine, Ten, and Eleven of their Second Amended Complaint (doc. 56).  Having carefully reviewed the Plaintiffs' Second Amended Complaint, the Court agrees with the Defendants that individual Defendants, Massie and Miller, should be dismissed from this lawsuit as no claim remains against them.

**A.   DEFENDANTS' ARGUMENT THAT THE BOARD IS ENTITLED TO SUMMARY JUDGMENT ON CLAIMS ONE, TWO, NINE, TEN, AND ELEVEN PURSUANT TO CHAPTER 2744 OF THE OHIO REVISED CODE**

Defendants maintain that Chapter 2744 of the Ohio Revised Code provides immunity to the Board as to all state law claims (doc. 52).  Chapter 2744 purports to grant to political subdivisions (such as the Board) immunity from tort liability, limited only by the exceptions found within the Chapter.  See Ohio Rev. Code Ann. §§ 2744.01 et seq. (West 2004).  Specifically, the Board maintains that it is immune from Claim One - state law claim for defamation - and Claim Two - state law claim for invasion of privacy.  As noted above, Claims Nine, Ten, and Eleven have been dismissed by the Plaintiffs.  The Court finds this argument of the Board persuasive.

Wilson v. Stark County Dep't of Human Serv., 639 N.E.2d 105, 107 (Ohio 1994), states: "[t]here are no exceptions to immunity from the intentional torts . . ." caused by a political subdivision's employees (Id.).  The Court has found no Ohio case stating Wilson is incorrect in its determination.  As such, the Court turns to whether the torts of defamation and invasion of privacy, under Ohio law, are classified as intentional torts.  The Court finds that indeed they are.  In Filotei v. Booth Broad. Co., 1981 WL 4676 (Ohio Ct. App. Dec. 10, 1981), the Court of Appeals of Ohio, Eighth District held that:

> [The] invasion of the right of privacy 'is an intentional tort analogous to trespass and battery in protection of personal integrity.' A mere negligent intrusion into one's private

-17-

> activities does not constitute an actionable
> invasion of the right of privacy. Thus, if
> the trier of facts were to accept, as the
> trial court did, the defendant's testimony
> that the communications were only negligently
> and not intentionally sent, there could be no
> right of recovery.

Filotei at *3 citing Lecrone v. Ohio Bell Tel. Co., 201 N.E.2d 533,

536 (Ohio Ct. App. 1963). As mere negligence would not suffice to

maintain an invasion of privacy action, intentional conduct is

required. Since a political subdivision is immune from liability

pursuant to Section 2744 and Wilson for the intentional torts of

its employees, Plaintiffs' claim for invasion of privacy against

the Board/District must fail as a matter of law.

Likewise, defamation has been viewed by the Ohio

courts as an intentional tort. See e.g., Cooper v. Grace Baptist

Church of Columbus, Ohio, Inc., 612 N.E.2d 357, 363 (Ohio Ct. App.

1992) (throwing defamation into the same bailiwick as other

intentional torts); Holzbach v. Jackson Twp., 2000 WL 1035798 (Ohio

Ct. App. July 26, 2000) ("[t]his court has previously reviewed the

issue of political subdivision immunity vis á vis claims for [the]

intentional tort . . . [of] defamation and have found political

subdivisions not to be liable for intentional torts."); and Iberis

v. Mahoning Valley Sanitary Dist., 2001 WL 1647184, *6 (Ohio Ct.

App. Dec. 21, 2001) (stating "this court [has] held that a claim of

defamation [is] . . . an intentional tort, entitling a political

-18-

subdivision to immunity as set forth in R.C. Chapter 2744."). Therefore, Plaintiffs' defamation claim against the Board/District is dismissed as a matter of law.

**B. PLAINTIFFS' CLAIMS ONE AND TWO - DEFAMATION AND INVASION OF PRIVACY  - AGAINST LLOYD EVANS**

### 1.  Right to Privacy

The Court now turns to Plaintiffs' Claims One and Two as they relate to Lloyd Evans.  Mr. Unroe first argues that the disclosures made by Lloyd Evans violate his right to privacy (Id.). Citing Section 3319.16 of the Ohio Revised Code, Mr. Unroe notes that "[t]he Loudermill hearing shall be private unless the teachers requests a public hearing" (Id.).  Mr. Unroe argues that he did not request a public meeting and, therefore, all evidence taken at the hearing was confidential (Id.).  Furthermore, Mr. Unroe, relying on Section 121.22 of the Ohio Revised Code, notes that executive sessions are appropriate where meetings are held for the purpose of investigating, addressing, and determining the appropriate discipline for public employees (of which Mr. Unroe was at the time of the hearing) and that public minutes of the meeting "need not include the name of any person to be considered at the meeting" (Id. quoting Ohio Rev. Code § 1211.22(G)(1)).  Section 121.22(C) also states that such meetings shall include only a general discussion of the issues addressed in executive session (Id.). Lastly, citing Sections 102.03(B) and 102.99(B), Mr. Unroe submits

-19-

that a public official may not use information obtained at this
type of meeting and doing so is a crime (doc. 50).

　　　　　　As such, Mr. Unroe concludes that Lloyd Evans'
actions were a per se violation of his right to privacy (Id.).  Mr.
Unroe cites Killilea v. Sears, Roebuck & Co., 499 N.E.2d 1291,
1294-95 (Ohio Ct. App. 1985).  In Killilea, the Court of Appeals of
Ohio for the Tenth District noted that the Ohio Supreme Court
recognizes three of the four types of invasion of privacy claims
enunciated by the Restatement of the Law (Second) Torts, Section
652A.  Killilea at 1294, citing Housh v. Peth, 133 N.E.2d 340 (Ohio
1956).

> An actionable invasion of the right of privacy
> is the unwarranted appropriation or
> exploitation of one's personality, the
> publicizing of one's private affairs with
> which the public has no legitimate concern, or
> the wrongful intrusion into one's private
> activities in such a manner as to outrage or
> cause mental suffering, shame or humiliation
> to a person of ordinary sensibilities.  The
> Supreme Court's opinion was silent regarding
> the third tort, the "false light" cause of
> action and, subsequently, the court
> specifically declined to recognize such a
> theory of recovery.

Killilea at 1294 quoting Yeager v. Local Union 20, 453 N.E. 2d 666
(Ohio 1983).  Plaintiffs assert the second type of invasion of
privacy contemplated in Killilea - the public disclosure type.

　　　　　　To establish this type of invasion of privacy a
plaintiff must establish: (1) that there has been a public

-20-

disclosure; (2) the disclosure was of facts concerning the private life of an individual; (3) that the matter disclosed would be highly offensive and objectionable to a reasonable person of ordinary sensibilities; (4) that the disclosure was intentional; and (5) that the matter publicized was not of legitimate concern to the public. Killilea at 1294-95. Mr. Unroe asserts that the first and fourth elements have been admitted by Lloyd Evans (doc. 50). As to the third element, Mr. Unroe avers that Lloyd Evans admitted he publicized what he characterized as Mr. Unroe's admissions that he was a child abuser (Id.). Mr. Unroe highlights Lloyd Evans' testimony in which he stated he would not want his own child taught by Mr. Unroe in light of the admissions made by Mr. Unroe at the hearing (Id.). Mr. Unroe contends that allegations that a teacher admitted to abusing a handicapped child under his care would be "highly offensive and objectionable to a reasonable person of ordinary sensibilities" (Id.).

Thus, Mr. Unroe concludes that the only two remaining elements for the Court to address are two and five (Id.). Referencing Denlinger v. City of Columbus, Ohio, Pub. Sch., 2000 WL 1803923 (Ohio Ct. App. Dec. 7, 2000), Mr. Unroe asserts that these two elements must be determined as established (Id.). In Denlinger the plaintiff, a school principal, was accused by a parent of child sexual abuse. Denlinger at *1. The school administration

-21-

responded to media inquiries concerning the charges against the plaintiff and released documents it had obtained from Children's Services. <u>Id</u>. Subsequently, the information was publicized by the media. <u>Id</u>. The plaintiff sued, asserting invasion of privacy. <u>Id</u>. The Tenth District Ohio Court of Appeals held that "despite the public's otherwise legitimate interest in the alleged on-the-job misconduct of school principals, appellees had no obligation to disclose the information alleged to have been disclosed and, in fact, were required by law to keep it confidential.[1]  <u>Id</u> at *10.

Mr. Unroe urges the Court to view the release of otherwise non-public information in the instant matter (information mandated confidential by Ohio Revised Code §§ 3319.16 and 121.22(G)(1)) similarly to the information disclosed in <u>Denlinger</u> and, consequently, find that Lloyd Evans invaded Mr. Unroe's privacy (doc. 50).  The Court finds that indeed a claim for invasion of privacy against Lloyd Evans is sustainable under the theory espoused by Mr. Unroe above.  However, the Court finds that genuine issues of material fact exist as relates to this claim and; therefore, the outcome of this claim must be determined by the trier of fact.

### 2. Defamation

---

[1] The information in <u>Delinger</u> was precluded from disclosure pursuant to Ohio Revised Code §§ 2151.421(H) & 5153.17 as well as Ohio Administrative Code § 5101:2-34-38.

Under Ohio law:

> The essential elements of a defamation action, whether slander or libel, are that: (1) the defendant made a false statement of fact; (2) that the false statement was defamatory; (3) that the false defamatory statement was published; (4) that the plaintiff was injured; and (5) that the defendant acted with the required degree of fault.

Molnar v. Klammer, 2005 WL 3528870, *16 (Ohio Ct. App. Dec. 23, 2005), citing Matikas v. Univ. of Dayton, 788 N.E.2d 1108, 1114-15 (Ohio Ct. App. 2003). Mr. Unroe quotes from the Restatement Second of Torts § 559 which states: "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Tort § 559 (1977); see also McCartney v. Oblates of St. Francis de Sales, 609 N.E.2d 216, 222 (Ohio Ct. App. 1992). Further quoting the Restatement, Mr. Unroe notes that: "To be defamatory, it is not necessary that the communication actually cause harm to another's reputation or deter third persons from associating with him . . . its character depends upon its general tendency to have such an effect." Restatement (Second) of Torts § 559(d); see also McCartney at 222.

Mr. Unroe contends that Lloyd Evans' remarks were slander per se (doc. 50).

Slander per se means that the slander is

> accomplished by the very words spoken. In
> order for an oral defamatory remark to be
> considered slander per se it must consist of
> words which import an indictable criminal
> offense involving moral turpitude or infamous
> punishment, imputes some loathsome or
> contagious disease which excludes one from
> society or tends to injure one in his trade or
> occupation.

McCartney at 222 (internal citations omitted).

> McCartney further states:

> The determination of whether a statement is
> slander per se or slander per quod is a
> question of law for the trial court.
> Depending on this determination the defamation
> action will be either per se or per quod. If
> the statements are deemed to be actionable per
> quod, the plaintiff must allege and prove
> damages. If the statements are found to be
> actionable per se, both damages and actual
> malice, are presumed to exist. Only where the
> court determines that the words in the
> published statement are ambiguous and that a
> defamatory meaning may be reasonably
> understood by innuendo does the trier of fact
> determine whether, in fact, the defamatory
> meaning was understood.

McCartney at 222 (internal citations omitted).

The Court first makes a determination as to whether the alleged defamatory remarks made by Lloyd Evans amount to slander per se. Utilizing the framework as enunciated in McCartney, the Court determines that indeed the remarks made by Lloyd Evans were slander per se. The alleged false statements made by Lloyd Evans impugned the integrity and professionalism of Mr.

-24-

Unroe.  In so determining, the Court has established that actual malice and damages exist.

Defendants argue that Mr. Unroe actually committed the acts reported by Lloyd Evans (doc. 52).  However, the Court sees a subtle distinction.  Mr. Unroe takes issue with Lloyd Evans' statements to several news agencies that he admitted at the disciplinary hearing to dragging a handicapped child by the heels and forcefully handling a handicapped child.  It may very well be that he did these things to some degree, as Defendants maintain he did, yet this is not the question.  The question is whether he admitted to committing these acts *at the disciplinary hearing*. That is the slanderous language objected to by Mr. Unroe - specifically, that Lloyd Evans stated that Mr. Unroe admitted to this conduct during the course of the disciplinary hearing. Defendants also argue that Lloyd Evans does not recall making some of the remarks reported in the press or that he was simply misquoted by the press.  At the very least, the Court finds that genuine issues of material fact exist as to the truth or falsity of Lloyd Evans' statements and whether he did in fact make the statements reported by the press.  As such, summary judgment on Plaintiffs' Claim against Lloyd Evans for defamation is not appropriate for either Party.

Mr. Unroe, in his Partial Motion for Summary

-25-

Judgment, argues only that this Court should find summary judgment appropriate as to his Claims of invasion of privacy and defamation against Lloyd Evans and the Board (doc. 50). The Court, as discussed above, is unwilling to do so. Defendants also argue that summary judgment should be granted in its favor as to these two claims (doc. 52). Also, as discussed above, the Court finds that Defendants' Motion should be granted on these two claims as it relates to the Board/District but not as it relates to Lloyd Evans.

**C. PLAINTIFFS' CLAIMS FOUR, FIVE, AND EIGHT – SECTION 1983 VIOLATIONS**

The Court now turns to the remainder of Defendants' Motion for Summary Judgment (doc. 52). Defendants argue that Mr. Unroe's Due Process Claims against the Board/District, Lloyd Evans, Fred Evans, and Vicki Evans should be dismissed as a matter of law (Id.). These Claims consist of: (1) that the Board, through a custom and practice of discrimination, maliciously and intentionally deprived Precious, Denzell and Unique of the right to a full and equal public education under color of law and that the Defendants retaliated against the Unroes under color of law because of the communication of protected speech made by the Unroes – specifically, concerns regarding the pubic education of African American and disabled students offered by the District; (2) that the Defendants, acting under color of state law, maliciously and intentionally retaliated against the Unroes' protected speech by

(a) fabricating reasons for Mr. Unroe's suspension and ultimately his termination under color of law, (b) by denying him employment in the 2003-2004 school year, and (c) by publicizing false information they knew would prevent Mr. Unroe from obtaining employment in his chosen profession; and (3) that Defendants, acting under color of state law, maliciously retaliated against Plaintiffs in denying the Unroes the right to educate their children as they saw fit and the children's right to an education; and in so doing, in making false and unsubstantiated accusations against the Plaintiffs of child abuse, thus subjecting them and the children to the fear and humiliation of an investigation into the Unroe's fitness as parents (doc. 21)

Citing Gomez v. Toledo, 446 U.S. 635 (1980), the Defendants note that to state a claim under Section 1983, a plaintiff must prove: (1) that the defendant deprived him of a right secured by the Constitution or laws of the United States and (2) that in so doing, the defendant acted under color of state law. Gomez at 640.  Municipal liability, pursuant to 42 U.S.C. § 1983, can not be found based on the doctrine of respondeat superior. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-92 (1978).  To find municipal liability, which in the instant matter would be liability on the part of the Board/District, pursuant to Section 1983 a plaintiff has two possible routes.

-27-

First, the plaintiff can establish that an unconstitutional policy statement, ordinance, regulation, or decision was formally adopted and promulgated by the governing body or department thereof. Id. Second, Monell allows the imposition of governmental liability where the challenged conduct reflects "practices of state officials so permanent and well settled as to constitute a 'custom or usage' with the force of law." Monell at 691. The policy maker may have either actual or constructive knowledge of the practice or may simply acquiesce in the unconstitutional custom or practice for liability to attach. See e.g., Memphis, Tennessee Area Local, American Postal Workers Union v. City of Memphis, 361 F.3d 898, 902-03 (6th Cir. 2004); Miller v. Calhoun County, 408 F.3d 803, 814 (6th Cir. 2005) . Furthermore, acts of omission as well as commission, may serve as the predicate for a finding of unconstitutional policy or custom. See e.g., Doe v. Claiborne County, 103 F.3d 495 (1996) (calling such an attachment of liability the "inaction theory"). In Doe, the Sixth Circuit held:

> To state a municipal liability claim under an "inaction" theory, . . . [the plaintiff] must establish: (1) the existence of a clear and persistent pattern . . . [of unconstitutional activity by the municipal employees] . . .; (2) notice or constructive notice on the part of the . . . [municipality]; (3) the . . . [municipality's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to

> act can be said to amount to an official
> policy of inaction; and (4) that the . . .
> [municipality's] custom was the "moving force"
> or direct causal link in the constitutional
> deprivation.

Doe at 508 (internal citations omitted).  Doe further held:

> The Monell custom requirement is an essential
> element of this claim.  The evidence must show
> that the need to act . . . [was] so obvious
> that the . . . [municipality's] conscious
> decision not to act can be said to amount to a
> "policy" of deliberate indifference to . . .
> [plaintiff's] constitutional rights.
> "Deliberate indifference" in this context does
> not mean a collection of sloppy, or even
> reckless, oversights; it means evidence
> showing an obvious, deliberate indifference .
> . .

Id.

The official policy must be adopted by someone "with final authority to establish municipal policy with respect to the action ordered." Pembauer v. Cincinnati, 475 U.S. 469, 481 (1986). Thus, Defendants argue that even if Plaintiffs produce evidence of the existence of unlawful conduct by individual employees at Rock Hill, the Board can not be held liable under Section 1983 unless they can also prove the existence of unconstitutional actions by the Board, itself (doc. 52 citing Hull v. Cuyahoga Valley Joint Voc. Sch. Dist. Bd. Of Educ., 926 F.2d 505 (6th Cir. 1991)).

Plaintiffs counter, arguing that their claim for violations of Section 1983 by the Board/District do not rest on existence of unconstitutional actions by the Board as contemplated

-29-

in <u>Hull</u>; but, rather, their 1983 claims against the Board/District rest on the "inaction" theory espoused in <u>Doe</u> (doc. 56). The Plaintiffs submit that the Board was on notice prior to 2003 that Lloyd Evans, as Superintendent of the District, had the propensity to unconstitutionally retaliate against those persons who challenged the District's treatment of disabled and minority students (<u>Id</u>.). Plaintiffs note that Lloyd Evans testified that in creating the News Release and giving other statements to the press that he acted on behalf of the District and Board as its spokesperson (<u>Id</u>.). Furthermore, Board member Wanda Jenkins verified that Lloyd Evans had been delegated the authority to speak on the behalf of the Board (<u>Id</u>.). The Board knew of, and acquiesced, in Lloyd Evans' unconstitutional conduct, argues Plaintiffs (<u>Id</u>.). Plaintiffs contend that this acquiescence is evidenced not only by receipt of letters written by Mrs. Unroe but also the testimony of Shara Jenkins (hereinafter "Jenkins") and Brenda (Mulkey) Reynolds (hereinafter "Reynolds").

Jenkins is the mother of Shanell Ratcliff (hereinafter "Shanell"), a child enrolled in the School during the 2000-2001 and 2001-2002 school years (<u>Id</u>.). Shanell suffers from diabetes (<u>Id</u>.). In the Fall of the 2001-2002 school year, Jenkins complained about the School's treatment of Shanell, specifically the School's refusal and reluctance to meet Shannel's needs (<u>Id</u>.).

-30-

Jenkins also testified as to Lloyd Evans' decision to unilaterally terminate Shanell's enrollment which he was later required to rescind (Id.).

Throughout Jenkins' ordeal with the School and the alleged mistreatment of Shanell, Jenkins wrote an op-ed piece in the *Ironton Tribune* criticizing the District's treatment of children with diabetes (Id.). Jenkins also complained to the United States Department of Justice, Office of Civil Rights (Id.). Subsequent to these two events and allegedly at Lloyd Evans' direction a charge was made against Jenkins for child neglect with the LDJFS (Id.). According to Jenkins, Lloyd Evans stated in a conversation between the two on December 7, 2002: "Well, Mrs. Jenkins, you contacted the Office of Civil Rights and got an investigation started, so I figured I'd start one of my own" (Id.).

Lloyd Evans also purportedly stated in response to a question from Jenkins as to why he contacted LDJFS that he did not "like being pushed around" and that he did not "take that [being pushed around] too lightly" (Id.). Ultimately, Jenkins had to defend herself against these charges for months before the charges were found unsubstantiated (Id.). Lloyd Evans also allegedly commented in response to Jenkins' notification that she was going to hire an attorney that Jenkins was wasting her time and that he "ha[d] a lot more pull than [Jenkins] and [that no]

attorney [was] gonna stand up to [him], because they know they can't win" (<u>Id</u>.).

Jenkins spoke numerous times with members of the Board regarding her concerns and interactions as highlighted above (<u>Id</u>.). Jenkins' communications to the Board began immediately after Lloyd Evans informed her that Shanell could not return to the School (<u>Id</u>.). Jenkins reported that she first talked with Wanda Jenkins who purportedly spoke with Lloyd Evans concerning the issue (<u>Id</u>.). Jenkins also contacted Board member Troy Hardy who allegedly hung up on her (<u>Id</u>.). She was later told by another male Board member that there was nothing the Board could do about Lloyd Evans' behavior (<u>Id</u>.).

Reynolds is also a mother who enrolled a child in the School (<u>Id</u>.). Reynolds' child, Charles Littlejohn, was diabetic and required special assistance (<u>Id</u>.). Allegedly the special assistance required was not rendered and when Reynolds complained about such, she received a visit from LDJFS (<u>Id</u>.). Lloyd Evans was allegedly aware of Reynolds' complaints (<u>Id</u>.). Plaintiffs submit that on March 18, 2003 a School nurse, at the direction of Fred Evans, reported Reynolds to LDJFS for child neglect (<u>Id</u>.). Plaintiffs contend that these charges were false and, in fact, Reynolds was ultimately cleared of any charges.

The Court must ask whether genuine issues of

-32-

material fact exist as to the requirements of <u>Gomez</u>.  First, the issue of whether a constitutional right was deprived must be addressed.  It can not be disputed that the right to "direct the education and upbringing of one's children" is a fundamental, constitutional right." <u>See</u> <u>e.g.</u>, <u>Posthumus v. Bd. of Educ. of Mona Shores Pub. Sch.</u>, 380 F. Supp. 2d 891, 899 (W.D. Mich. 2005), <u>citing</u> <u>Seal v. Morgan</u>, 229 F.3d 567, 574-75 (6th Cir. 2000).  Defendants object to the evidence of Jenkins and Reynolds, questioning its relevance.  The Court notes, however, that it is relevant as it relates to the existence of a pattern and practice to which the Board knew of and acquiesced.  The testimony of Jenkins and Reynolds, coupled with that of the Unroes, is sufficient to raise genuine issues of material fact as to whether children with disabilities  were unfavorably treated by the District, the Board, and the individual Defendants as well as African-American children.

Clearly if the allegations of Jenkins and Reynolds are true and if the allegations of the Unroes are true, then it might tend to lead the trier of fact to the conclusion the Board/District knew of and acquiesced in the unconstitutional actions of the individual Defendants, Lloyd Evans, Fred Evans, and Vicki Evans via the Board/District's inaction.  Although the genuine issues of material fact appear stronger as they relate to

children with disabilities, the Court finds that a reasonable jury could conclude, based upon Lloyd Evans' statements to the LDJFS concerning the Unroes, that race also played a part in the Defendants' conduct.  Additionally, viewing the evidence in favor of the non-moving party, the Plaintiffs, the Court finds that genuine issues of material fact exist as to Plaintiffs' claim that Defendants interfered with Mr. Unroe's fundamental right to free expression.  See e.g., Perry v. McGinnis, 209 F.3d 597 (6th Cir. 2000).  Additionally, a plaintiff's 1983 claim can be predicated on a "violation of an explicit constitutional guarantee or on behavior that 'shocks the conscience." Mansfield Apartment Owners Ass'n v. City of Mansfield, 988 F.2d 1469, 1474 (6th Cir. 1993).  The Court finds that the trier of fact should determine whether the allegations of retaliation "shock the conscience."  Accordingly, summary judgment shall not be granted in favor of the Defendants on Plaintiffs' 1983 Claims.

**D. THIRD, FOURTH, SIXTH, AND SEVENTH CLAIMS OF SECOND AMENDED COMPLAINT THAT DEFENDANTS VIOLATED THE PROHIBITIONS AGAINST DISCRIMINATION FOUND IN 42 U.S.C. §§ 1981 & 2000d.**

42 U.S.C. § 2000d provides in pertinent part that "[n]o person . . . shall, on the ground of race . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program . . . receiving Federal financial assistance."  42 U.S.C. § 2000d.  A plaintiff may sue

-34-

under Section 2000d for violations of the guarantee to a full and
equal education, seeking both injunctive relief and damages.
Alexander v. Sandoval, 532 U.S. 275, 280 (U.S. 2001).  A plaintiff
is not required to exhaust state administrative remedies before
bringing suit in federal court pursuant to Section 2000d.
Neighborhood Action Coalition v. Canton, 882 F.2d 1012, 1015 (6th
Cir. 1989).  The Sixth Circuit has held:

> [T]o avoid summary judgment on a claim under §
> 2000d, a plaintiff must create a genuine issue
> of material fact that the defendant intended
> to discriminate on the basis of race.   To
> establish a genuine issue of material fact
> that the defendants intentionally
> discriminated against plaintiff . . . on the
> basis of race, plaintiff must demonstrate that
> the [discriminatory action] was motivated by
> race that [the plaintiff's race] was a
> determining factor . . . In other words, proof
> of discriminatory intent is critical.   It
> follows that where the decisionmaker is
> motivated by a factor other than the
> [plaintiff's] race, there can be no
> intentional discrimination.

Buchanan v. City of Bolivar, 99 F.3d 1352, 1356 (6th Cir, 1996)

A plaintiff bringing an action pursuant to the
"equal benefit clause" of 42 U.S.C. § 1981 must demonstrate that

> [O]ne party denie[d] another the "full and
> equal benefit of all laws and proceedings for
> the security of persons and property as is
> enjoyed by white citizens."  The "security of
> persons and property" language limits the
> potential class of cases that may be brought
> under the equal benefit provision.  A litigant
> must demonstrate the denial of the benefit of

> a law or proceeding protecting his or her
> personal security or a cognizable property
> right. Further to prevail on a section 1981
> claim, a litigant must prove intentional
> discrimination on the basis of race, which
> involves a high threshold of proof.

<u>Chapman v. Higbee Co.</u>, 319 F.3d 825, 832-33 (6th Cir. 2003) (<u>en</u>

<u>banc</u>).

The familiar <u>McDonnell-Douglas/Burdine</u> shifting

paradigm applies equally to Section 1981 claims as it does to Title

VII claims (<u>i.e.</u>, Plaintiffs' Section 2000d claim).[2]  <u>See</u> <u>e.g.</u>,

<u>Johnson v. Univ. of Cincinnati</u>, 215 F.3d 561, 572 (6th Cir. 2000).

Furthermore, a plaintiff may prove a discriminatory intent either

via direct or circumstantial evidence - neither route is more

preferable. <u>Id</u>.  The Court agrees that in non-employment

situations, the test for a <u>prima facie</u> case is most appropriately

set forth in <u>Christian v. Wal-Mart Stores, Inc.</u>, 252 F.3d 862 (6th

Cir. 2001).

In <u>Christian</u> the Sixth Circuit stated that a

plaintiff's <u>prima facie</u> case, in non-employment settings, is

established by plaintiff demonstrating: (1) he is a member of a

protected class; (2) that he sought to make or enforce a contract

---

[2] The Court will not discuss in depth the <u>McDonnell-Douglas/</u>
<u>Burdine</u> shifting paradigm.  Suffice it to say, if a plaintiff
establishes his <u>prima facie</u> case, then the burden shifts to the
defendant to proffer a legitimate, non-discriminatory reason for
its actions.  If a legitimate, non-discriminatory reason is
proffered, the burden shifts back to the plaintiff to prove that
the legitimate, non-discriminatory reason was merely pretext.

for services ordinarily provided by the defendants; and (3) that he was denied the right to enter into or enjoy the benefits or privileges of those services in that (a) he was deprived the services while similarly situated persons outside the protected class were not and/or (b) he received the services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory. Christian at 872. If a plaintiff establishes the above prima facie case, the burden shifting paradigm would then apply.

The Court finds that genuine issues of material fact exists as to whether a discriminatory intent motivated the actions of Defendants. The testimony of Jenkins and Reynolds again helps create a genuine issue of material fact as to Lloyd Evans' retaliatory and discriminatory nature. Although the children of Jenkins and Reynolds were allegedly mistreated due to their disabilities and not race, this practice would tend to lead a jury to infer that discriminatory intent was present. Furthermore, Hicks' testimony regarding Lloyd Evans' "I don't want them kind around here . . ." statement is the type of evidence that again could lead a reasonable jury to infer that a discriminatory intent was present. Couple this with the allegations that Mr. Unroe was retaliated against and accused of child abuse not only against his school children, but his own children as well, all during the same

time that his African-American students were enrolled in the School supports the conclusion that this issue is not ripe for summary judgment.  If the allegations in this matter are true, the Court would be most troubled.  However, it is not the Court's role to decide whether the testimony of one individual should be believed over that of another - that is the trier of fact's job.  As such, the Court will not grant summary judgment in favor of the Defendants on the Plaintiffs' Section 2000d and 1981 claims.

**E.  EFFECT OF COLLECTIVE BARGAINING AGREEMENT**

Defendants argue that all of Mr. Unroe's "employment related" claims are barred as a result of the Collective Bargaining Agreement which provided, "the filing of a grievance is a waiver of any employee's right to proceed with the same matter, or a charge with a state or federal agency or a complaint in state or federal court, excepting the right to appeal an arbitrator's decision as provided herein" (doc. 52).  Defendants note that Mr. Unroe acknowledged that he failed to exhaust all of his remedies under the Collective Bargaining Agreement and, as such, Mr. Unroe is barred from pursuing his employment-related claims in federal or state court (Id. citing State ex rel Johnson v. Cleveland Heights, 652 N.E.2d 750 (Ohio 1995).  However, Plaintiffs note that this argument applies, if at all, only to the Fifth and Sixth Claims of the Second Amended Complaint, as the submission of a dispute to

grievance procedures under a collective bargaining agreement do not foreclose a plaintiff from filing and prosecuting claims under federal or state statutes. See e.g., Alexander v. Gardner-Denver Co., 415 U.S. 36, 49-50 (1974). Gilmer v. Interstate Johnson/Lane Corp., 500 U.S. 27 (1991) discussed in depth the decision in Gardner-Denver. The Gilmer Court noted that rights asserted pursuant to statutes are independent of any arbitration process. Gilmer at 34.

The Court quotes extensively from Thompson v. General Electric, 723 N.E.2d 1139 (Ohio Ct. App. 1999), which clarifies the Gardner-Denver decision.

> It is true, of course, that a union may waive certain statutory rights related to collective activity, such as the right to strike. These rights are conferred on employees collectively to foster the processes of bargaining and properly may be exercised or relinquished by the union as a collective bargaining agent to obtain economic benefits for union members. Title VII, on the other hand, stands on plainly different ground; it concerns not majoritarion processes, but an individual's right to equal employment opportunities. Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices. Of necessity, the rights conferred can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII. In these circumstances, an employee's rights under Title VII are not susceptible of prospective waiver. This court continues to follow, as it did in Traux, the line of cases headed by Gardner-Denver, and

-39-

extends this holding to civil rights claims
brought pursuant to R.C. Chapter 4122. We see
strong policy reasons in favor of this
holding. Labor arbitrators are authorized
under a collective bargaining agreement to
resolve contractual claims, not statutory
claims. Labor arbitrators have developed a
body of expertise in labor law. This is why
the law presumes the arbitrability of disputes
based upon a collective barganing agreement.
This is not, however, the same body of
expertise or the same body of law implicated
by civil-rights statutes. Nor are the
remedies the same. This court also believes
that the rationale of <u>Gardner-Denver</u> was
expressly approved by the Ohio Supreme Court
in <u>Youghiogheny & Ohio Coal Co. v. Oszust</u>.

<u>Thomas</u> at 1142-1143. The Court agrees with Plaintiffs and the
court in <u>Thomas</u> that the presence of a collective bargaining
agreement does not preclude Mr. Unroe seeking remedy via statutory
rights.

**F. FAILURE TO EXHAUST REMEDIES UNDER THE IDEA**

Lastly Defendants argue that Plaintiffs' Fourth
Claim (<u>i.e.</u>, Denzell and Unique's 1983 claim) is actually a "back
door IDEA (Individuals with Disabilities Act) action" (doc. 52).
The Defendants argue that even if a plaintiff does not bring a
claim under the IDEA, the law is clear that exhaustion of IDEA
administrative remedies is a prerequisite for filing any federal
claim for relief which is also available under the IDEA (doc. 52
<u>citing</u> <u>Covington v. Knox County Sch. Dist.</u>, 205 F.3d 912 (6th Cir.
2000)). Defendants aver that Plaintiffs should have made a written

request for an IDEA due process hearing, specifying the specific issues to be resolved under Ohio Administrative Code § 3301-51-02(G)(2)(e) and exhaust all of their administrative remedies (doc. 52). Plaintiffs did not do this, so Defendants maintain that Claim Four of the Amended Complaint must be dismissed (_i.e._, the children's "equal access to public education" claim).

Plaintiffs counter noting that _Covington_ notes that exhaustion is required only where a plaintiff seeks relief that is "also available under" the IDEA (doc. 56 _citing_ _Covington_ at 915). Plaintiffs argue that neither Mr. Unroe's claims, nor those of his wife or children, arise out of the IDEA (doc. 56). Even if the requirements of the IDEA administrative procedure were applicable, Plaintiffs contend that under the holding of _Covington_, exhaustion would be futile and therefore they would not be required to exhaust administrative remedies (_Id_.). The _Covington_ court held that since there was no provision of monetary damages under the IDEA, and since the child was no longer enrolled in the district, the condition creating the violation had ceased and there was no possible remedy an administrative officer could provide. _Covington_ at 916-17. In the instant matter, as in _Covington_, the children were no longer enrolled in the School. Therefore, concludes Plaintiffs there is no remedy available under the IDEA. The Court agrees and does not find Defendants argument on this issue

-41-

persuasive.

**CONCLUSION**

Therefore, Claims Nine, Ten, and Eleven are hereby DISMISSED per the request of the Plaintiffs.  As a result, all Claims against Connie Miller and April Massie are DISMISSED.  The Court DENIES the Plaintiffs' Motion for Summary Judgment finding that genuine issues of material fact are present (doc. 50).  The Court GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment (doc. 52), in that it DISMISSES AS A MATTER OF LAW Plaintiffs' Claims of Invasion of Privacy and Defamation against the Board/District.  However, all remaining Claims against all Defendants remain.

SO ORDERED.

Dated: January 4, 2006          s/S. Arthur Spiegel

                                S. Arthur Spiegel
                                United States Senior District Judge

-42-